My name is Kyle Dicker. I represent the Commissioner of Appellate Sean Baker. This is not a case about ineffective assistance in counsel. This is a case about no assistance in counsel. Your Honors, if the Sixth Amendment means anything, it means that a defense lawyer must do something to subject the prosecution's case at sentencing to adversarial testing. But Sean Baker's lawyer, Mr. Bruneau, did nothing. And let me tell you what I mean. Mr. Bruneau made no presentation at Mr. Baker's sentencing hearing, except to say that he had nothing to say. Well, he said that the court was well familiar with the facts and circumstances of the case, which were pretty substantial. This young man was involved in robbing a person who was completely inebriated and had been thrown out of a restaurant because he was so drunk. And there's video of what he did. And after he's done going through his pockets and stealing, he and his co-conspirators throw him down a staircase, for which he dies. Now, it's hard to find any redeeming social value in that conduct, wouldn't you agree? No, and if I may make one correction to what Your Honor said, Mr. Baker did not himself rob. He committed felony murder. And the state of New York holds him equally responsible. Had he professed his innocence in the PSR before sentencing? And so I understand that you're trying to make a case that this lawyer did nothing. By the way, by saying nothing, he got a 20% reduction in the sentence he got from what the government was looking for, didn't he? He did. So 20% doesn't count. Your Honor's question— Does it count? I still think, notwithstanding the fact that he did not get the maximum sentence, I still think— Would 30% count? What if it had been 50%? I think there is a reasonable probability here, Your Honor, that Mr. Baker received a harsher sentence than he otherwise would have because of his counsel's conduct. And his counsel, who did nothing, at the same time negotiated that the government would continue with its plea agreement with regard to an outstanding robbed second via felony under New York law, and agreed, notwithstanding the fact that the government pressed her 25 to life, that it would agree to concurrent time. Is that correct? I think what— Is that nothing? What Mr. Bruno did in connection with the unrelated robbery events shows that, in fact, he did not have to pay for his client. That doesn't count. It does count, Your Honor, but it's for a separate offense. Did the judge participate in the plea negotiations? I don't know, Your Honor. You know, in New York, they can. Your Honor, what the record shows is that the advocacy, that whatever advocacy Mr. Bruno made in connection with the unrelated robbery events occurred after the sentence had already been imposed on the felony murder offense. And therefore— Wait, no, there had been advocacy preceding it because what it was was an agreement to continue the previously negotiated agreement. Your Honor, after the judge imposed the 20-year sentence on the felony murder offense, the next thing that the judge said was to adjourn the unrelated robbery events. Because the court wasn't clear to the court whether they were going to continue to adhere to that agreement. What that shows is that whatever happened after that was separate and unrelated and could not have influenced the judge's decision on the 20-year felony murder offense. But let me turn to what I think is the heart of this matter, which goes to one point, Your Honor, which is the issue of readiness. This is not just in effect assistance for Mr. Bruno in New York. It was a total failure to subject the prosecution's case at sentencing to adversarial custody. I have a problem with this also in the sense that that's not what was requested in the Certificate of Appealability. You didn't even raise this case in the Certificate of Appealability. I participated in that. And it's not mentioned in the Certificate of Appealability. How do you get to raise it now? So we did raise this in our brief, Your Honor, and what the Certificate of Appealability allows us to make is the argument that the confidence in the outcome of this proceeding was undermined by Mr. Bruno's unprofessional failures. This is exactly what the chronic presumption gets to, Your Honor. The chronic presumption recognizes that there is a total failure to subject the prosecution's case to adversarial testing. The outcome – Did you argue that? Did you argue that in the 440? We did, Your Honor. We cited chronic in that brief, yes. Did you – no, you cited it. But did you argue that you were entitled to a presumption of prejudice? We cited chronic, Your Honor. You did not argue – you did not argue at the appellate division that you were entitled to a presumption, did you? Not in as many words. I don't mean you. I don't mean you, counsel. We cited chronic.  Thank you, Your Honor. So my question is directed at the 440 and at the appellate division. There was no argument about the entitlement to a presumption of prejudice, was there? We cited chronic in that brief, Your Honor. We cited it for the proposition that where there is no adversarial testing, our confidence in the outcome of the sentencing proceeding is inherently undermined.  And the case that we are primarily relying on in addition to chronic is Bell v. Cohn, where the Supreme Court reaffirmed the central holding of chronic and confirmed that chronic applies at sentencing in a case where there is no adversarial testing. This is exactly that case, Your Honors. You need – you really need chronic to win here, right? Because if there is a question – if the question of prejudice is open, don't we owe deference to the state court's finding that the sentence would have been the same regardless of anything that has now been brought to the attention of the judge who happens to have been the same judge who imposed the sentence in the first place? Your Honor, I certainly think that under the egregious facts here we are entitled to the chronic presumption. However, I do think that we can still demonstrate traditional circumstances for Mr. Baker. I would point, Your Honors, to various statements by the sentencing court, which among other reasons – there are multiple reasons – but primarily there are statements by the sentencing judge indicating that the judge held the exaggerated view of Mr. Baker's level of culpability in the underlying defense. For example, at the sentencing hearing itself, the judge said erroneously that Mr. Baker assisted in the act of throwing the victim down the flight of stairs. That's simply not true, Your Honor. Is there a reason – I mean, with regard to that point in particular, given that this was the trial judge, is there really reason to think that he was not aware or didn't remember that the particulars and the fact that Mr. Baker was not the person who actually threw the victim down the stairs? So I would answer that question in a few ways, Your Honor. Although maybe – well, first of all, the mitigating evidence related to Mr. Baker's childhood, foster homes, and all of his schools, obviously that did not come out of trial. As to his role in the offense, these facts did come out of a trial, yes. However, they weren't actually relevant to his guilt or innocence. Yes, but didn't he – but, I mean, he did participate in bringing the gentleman to the place where he was then thrown down the stairs, right? Right. He did, Your Honor. Well, but isn't that – isn't that assisting? I mean, as a matter of law, that's aiding and abetting what ultimately occurred. As a matter of law, yes. So why would you then – I mean, I understand that in the vernacular there's a difference between helping throw someone down the stairs, which sounds very active, and assisting in the crime that is being thrown down the stairs. But this is a judge. He understands that difference. I don't know why you would conclude that he meant to say that Mr. Baker actually participated in the act of throwing because he says he assisted in what ultimately is throwing the man down the stairs. I mean, why did he – why did they bring him to the stairs in the first place rather than leave him where he was? The judge said that Mr. Baker assisted in the fraud, which he did not do. But as a legal matter, he did. As a matter of law, he did assist. That's what aiding and abetting means, and he aided and abetted in that action. And again, I'm having trouble understanding. If he participates in bringing the man to the stairway, he was well and truly robbed by that time. He was totally drunk. He could have been left where he was. Instead, he was brought to the stairway where one of the three robbers throws him down the stairs. Not Mr. Baker. But Mr. Baker clearly assisted in that process by assisting in bringing him to the stairway. I don't understand why you would say that the judge who saw the tapes and heard the testimony had a misimpression of what Mr. Baker's role was rather than that he was applying the legal rule that would say that Mr. Baker assisted in that act and is responsible for it. The legal rule goes to his guilt, for instance. That was always relevant at trial. It doesn't fully get to what's relevant at sentencing, which is his level of culpability in the underlying offense. And so even though these facts came out at trial, that is not all that was relevant at the sentencing. This is why we have sentencing hearings, Your Honors, because there are other facts that are relevant to sentencing that are not directly relevant to an independent's guilt, for instance. And that's the distinction here. At trial, what came out was that Mr. Baker participated in the offense enough to be guilty as an accomplice to felony murder. However, what should have happened at the sentencing hearing is that Mr. Baker should have had a lawyer to advocate with him, to emphasize that he was less culpable than Mr. Alley, to emphasize that his role in the offense was relatively limited. That's what's relevant at sentencing. And had he had that same counsel, there is a reasonable probability that the outcome of this proceeding would have been different. The – Mr. Bruno didn't give us the benefit of an affidavit. Mr. – we'll get to it in a second. Now, Mr. Baker's counsel spoke to Mr. Bruno and characterized the conversation with him, and the government did the same thing, correct? Correct. And Mr. Bruno characterized to the government, as I recall, that Mr. Baker sat throughout the trial and was – his conduct was concerning to Mr. Bruno because of his – the way he – these expressions on his face. And that – you know, it's been a long time since I was in criminal trial court in Monroe County Supreme Court, but I spent four years there. And there were some trials where it might have been better just not to say anything. Mr. Bruno was a longstanding veteran of this court. He tried – he knew this judge. Isn't there – and he did say something. He said, you're familiar with what happened during the trial, Your Honor. Now, you've got other aspects of your claim in terms of encouraging the client to – his client to indicate his remorse that he mentions in his affidavit, things like that. But you need to tell me that maybe or perhaps not saying anything couldn't be a good, sound, strategic decision in light of the way Bruno had characterized his behavior during the trial itself. Your Honor, perhaps there is a case out there where saying nothing is the right strategy. Second-guessing is always easy, counsel. Second-guessing is always easy in a court twice removed from where the action is. I understand, Your Honor, but there is plenty that this lawyer could have said. What would he have said? This is a 17-year-old detective, first of all. Who's had a prior robbery reduced to a youthful offender, who's got an outstanding rob second, who's now confronted with a murder two, felony murder. A 17-year-old defendant with a troubled past, a troubled past because he grew up being passed between foster homes and as a final shelter. He suffered physical abuse. He went to like 10 different schools before dropping out. I mean this is a person with a particularly troubled background. And I find it very hard to say that it's an objectively reasonable strategy not to bring that out at sentencing. Moreover, the lawyer didn't even investigate this, right? Maybe you can make a calculated decision not to bring this out at sentencing, but this lawyer didn't even find out what these facts were in the first place. He didn't speak to Mr. Baker. He didn't speak to any members of Mr. Baker's family. He received a PSR that was facially self-contradictory. That said, you know, he repeated a few of the facts that I've said, but then said that he grew up in a moderately stable home environment. A reasonable advocate would at least take that as a sign that he should have investigated to see what facts were out there. There's plenty of case law. But if all of those facts were brought to the judge's attention in the post-trial proceedings, then the judge said it wouldn't have made any difference to him. So, Your Honor, first of all, as to the judge's political decision, what I would say there is that there are still statements in that decision that show that the judge did not appreciate Mr. Baker's limited role in the underlying case. And I understand the evidence that had been brought forward at that point. But if I might point, Your Honor, to two places in that decision. First, where the judge says that the defendants were all cruelly victimed down the flight of stairs, which is not true. That's on page 192 of the record. Second, also in that decision, the judge states that the victim's death was attributable to both defendants equally. That's on page 190. That's a matter of law. That is a matter of law. That is true as a matter of law. So it's a fair statement of the law. I don't read the decision as talking about the felony murder rule or the principle of constituting. I read the decision as speaking just about the facts of this case as sort of a matter of reality. What is the explanation for all three defendants bringing this man to the head of the stairway? Honestly, I don't know, Your Honor. Because there is none. There is no reason to do that. They all participated in that, and then one of them threw him down the stairway. But why did he get to the stairway? As I said before, he was robbed. It was over. The crime of robbery was complete. The man was evidently so drunk that he might have had a hard time identifying these people, although they remarkably committed the crime in front of people who knew them and were able to identify them. But the victim was pretty well out of it, no threat to them, wasn't going to chase them down, wasn't going to call a cop. And instead, they brought him to the head of the stairway where one of them proceeded to push him down. And I'm having trouble understanding why a judge wouldn't quite reasonably say that the other two who helped bring him to the stairway were equally responsible for his demise. One could quarrel with that, but that's what the judge said, and it seems to me it's not at all an unreasonable thing for the judge to say. Your Honor, I don't attest that my client participated in the events of the facts-making guilty of felony murder. I would note he was already facing a minimum sentence of 15 years to life based on the facts that Your Honor just described. And facing a possible 25 years to life. And facing a possible 25 years to life. But participating in a mugging and driving someone is not the same as killing them. But it seems to me it's very close to the same thing as participating in the subsequent crime separately. I mean, yes, it's prosecuted as a felony murder because that's easy for the prosecution to prove, and they would have had to show that he had some intention with respect to throwing him down the stairway. But I would think it's not that hard an inference for a jury to draw that if someone is dragged to a place where there's no reason to drag him to, and other than what actually happens, that somebody's going to push him down the stairs, that's a reasonable inference for someone to draw. And I guess I'm just – my point is just – I guess we're beating a dead horse. But I think that it's difficult to attribute to the judge a misunderstanding of the facts because he characterizes the facts in a particular way that corresponds to what the law – how the law treats the action. Your Honor, participating in the events the way that Mr. Baker did is not the same as – And that's why he got a five-year less sentence than the guy who did throw him down the stairs. It is the most basic role of a defense lawyer to bring out facts that we just described. And to emphasize Mr. Baker's lower role in the events than Mr. Allen. Now, the question about prejudice, about why Mr. Allen received a five-year higher sentence than Mr. Baker, there are many factors that influence sentencing. I don't know what happened in Mr. Allen's sentencing. There could have been other factors. All I know is that here you have a defendant who has limited role in the events, who has plenty of mitigating evidence related to his background, and he was entitled to a lawyer at sentencing to act as his advocate. And he didn't have that. He had said, Mr. Rubino, who sat back at the hearing and did nothing. And who did that because he hadn't prepared for the hearing. And what are these factors? Well, that's another puzzling thing. I mean it's – I'm very sympathetic to your argument that he didn't do what he should have done. But the notion, for example, that he did not meet with Mr. Baker is a little bit difficult to square with the fact that Mr. Baker then proceeds to enter a guilty plea that was negotiated by Mr. Bruno with a particular sentence to result from that. That doesn't usually happen with a defendant who hasn't been prepared to do it. Right? I mean there must have been some contact with the lawyer. Yeah. Mr. Bruno and Mr. Baker met on the morning of the sentencing. Right? That's clear from the record, and that is apparently when they talked about this plea to the unrelated property defense that the court took up after imposing the sentencing. There is no indication in the record, not in Mr. Baker's words, not in Mr. Bruno's words, that they ever met in the weeks between the trial and the sentencing. There's no indication that Mr. Bruno did any investigation. There's no indication that he, frankly, had any strategy at all. No. Okay. All right. You've got some rebuttal time. We'll hear from your adversary. We gave you your money's worth, Mr. Cutt. We gave you your money's worth. We gave you a hard time. Thank you. Good morning. I'm going to release the court. Paul Anderson for the Bronx County District Attorney's Office on behalf of Superintendent Conway. Mr. Anderson, we gave your opponent a hard time for quite a while. What I don't understand is once Baker makes an application under 440 and he calls into question what his lawyer did for him, hasn't he, in essence, under New York law, waived any privileges to conversations between him and Mr. Bruno? Yes, relating to the outset of the claim. And Baker made certain assertions with regard to what Bruno did or did not do, and to some degree someone from the government spoke to Mr. Bruno and kind of asked him about that, but the affidavit doesn't repudiate much of what Baker said that Bruno didn't do. I mean it doesn't repudiate that he explained to him felony murder and how that occurs or that he explained to him that he should express remorse to the judge and that he would have a chance to speak. There was just kind of a general characterization that Baker was difficult during trial, right? Yes. And so there's no affidavit by Bruno from the government? There's no affidavit by Bruno from either side. And because there's no affidavit from Bruno by the government, the court denies a hearing? That's part of one of the reasons. Well, and it also says that it's Baker's fault. Yes, it's because – Why does Baker have the obligation to repudiate or to corroborate what Baker himself has said? Well, if we look at – Under Strickland. Well, if we look at the entirety of the court's record, it's more than just this singular claim. Right. The court went through all the claims and found most of Mr. Baker's affidavit. Well, yeah, I mean like that Baker was informed that he had the right to speak, things like that. I understand that. But then also 440.30 sub 4D allows the court when only presented with the defendant's affidavit and when the court can just summarily deny the claim. Or if the affidavit is clearly repudiated. Well, you know, I went back and I looked at 440.10. I don't see where it says when it's only the defendant's affidavit it can deny a hearing. Where does it say that? 440.30 would be – it's 440.30, the procedural part, not the plaintiff's claim. Okay. So that, I think, informed the court as well as the other – Is that a – so under Strickland the obligation to prove prejudice is also to corroborate your allegations? Well, I think with prejudice we can look at the face of the record there in terms of that he got the 20-year sentence versus the 25-year sentence. Right. So I think that's the – Well, obviously I gave your opponent a really hard time, but what troubles me – what troubled me, I guess, was both at the trial court and at the appellate division. They seemed to say it was Baker's fault. Baker hadn't really created any kind of issue of fact because he didn't corroborate what he alleged, and I don't understand why he had to. It wasn't just that he didn't corroborate what he alleged. If what his allegations didn't go so far as to create an issue of fact, that would have been a material fact, that issue. Well, why wouldn't – How is that – Why wouldn't there be an issue of fact about what he and his – what Bruno and – The sad thing, of course, is that when the 440 is over, Bruno is no longer of this earth, but why wouldn't there be an issue of fact as to the value to speaking to the judge? I mean, I could envision Bruno saying, this is a big mistake if you get up and talk. Yes. Because you were difficult during the whole trial. It would be much better if you sit there and just look and don't interrupt anybody. There's a benefit to gain from that. That might reflect a strategy. That might reflect an assessment. This judge is a pain. This judge is a real bastard. This judge is going to throw the book at you because you're already – I've got all kinds of reasons, but there's nothing there. There is in that when you look at the record itself of the proceedings, that Mr. Baker was told twice he had not a duty to speak at sentencing, and when actually presided with, you had a statement to make. It wasn't a simple no. It was not at all. Right, but how does that go to – just to follow up on what Judge Wesley was saying – to his interactions with his counsel? I mean, he – Mr. Baker is asserting he didn't go over the PSR with me. He didn't do this. He didn't do that. And the statements we have from Mr. Bruno do not refute that. And what happened at sentencing does not refute that. At sentencing, in fact, it's interesting that the judge says to the attorney specifically, have you seen the PSR? Have you had a chance to look at it? Yes, and to both sides. He doesn't ask – he doesn't say to Mr. Bruno, have you shown it to Mr. Baker? Have you conferred with him? He doesn't ask Mr. Baker that. He asks specifically the attorneys, things of that sort that are not refuted by the record. I see what you're saying. I think the issue here is that that alone doesn't rise to the level of falling below that objective standard of reasonableness for an attorney at sentencing and certainly not in a reasonable way. Well, wait. I mean, the fact that the court tells the defendant you have a right to speak is quite a different thing than the attorney's obligation to counsel his client about what speaking would involve, what kinds of things to avoid, how to behave, whether it makes sense to make a statement and what sort of statement would make sense to make. All of that, I don't know why the man would think it was in his interest to make a statement unless his lawyer had discussed with him what is in his interest and what is not in his interest. And Mr. Baker says that never happened. And it seems to me it's on the prosecution to produce an affidavit from Bruno, not on the defendant. The defense says this guy's terrible. He didn't do anything. And I'm going to get an affidavit from him where he's going to corroborate that he's terrible and he didn't do anything. That's not realistic. That's not what usually happens. What usually happens is the prosecution goes and gets an affidavit from the lawyer who says, no, I did this, I did that, I did the other, this was my strategy, this was my tactic. And then at that point, at least in the federal courts, our rule is the judge doesn't have to have a hearing. The judge is entitled to believe the lawyer over the client when they're competing affidavits. Yes, Your Honor. The thing is, and I don't have the New York Court of Appeals case law to it, but in terms of pre-hearing 440 practice, an allegation doesn't shift, and even an affidavit doesn't shift the burden of proof back to the prosecution to rebut in order to. Well, no, it doesn't shift the burden, but it does establish an uncontested fact unless that fact is contested. It might establish a contested fact, but it's not a material fact that was warranted hearing. I don't know why there needs to be a hearing. The only evidence before the court is Mr. Baker's testimony that the lawyer did not talk to me about the sentencing proceeding at all, did not tell me about what I should or shouldn't say, or even for that matter that I had a right to say anything at all. I found that out when the judge told me. And he didn't go over the peace sentence report with me, so I had no opportunity to point out errors in it, et cetera. Now, why are those not material facts, and what is there that makes those issues rather than uncontested evidence that that's what happened? Well, for two reasons. So the Supreme Court in Strickland said that you can dispose of a claimant in a fact just by reaching prejudice first. So the 440 court here just belies whether there's an issue of fact of whether he met with him or not. It says, even if I consider all of these mitigation factors, I would impose the same sentence. And now the lawyer is trying to— All absolutely true, I think, except then that brings us back to chronic, because if chronic applies, then there's no need to show prejudice, and we don't get to that. Well, I think what we had with my friend over here discussing is that chronic requires that there be meaningful adversarial testing. And in terms of looking at a case, chronic itself says counsel may disturb the interests of the client by attempting a useless charade. And so here, when Mr. Bruno is presented with his client who, even taking away Mr. Bruno's own affidavit, who just nine days before sentencing maintained his innocence, who then has this open robbery case, which was a robbery one indictment, so technically he was facing 50 to life while walking into this proceeding. And so Mr. Bruno, the evidence shows or the record shows that he talks to the prosecutor. They go over the PSR together. They work out this arrangement. The prosecutor makes his record first, encompassing the errors of the PSR, facing the discussions. Here's where the potential plea is. And Mr. Bruno— Can I just jump in for a second? Because the way you're describing the sentencing proceeding, you're describing it as if the sentencing was like a joint sentencing for the murder and for the robbery. I don't believe that's the way that this occurred. I mean, there was a sentencing proceeding in which the discussion was about the murder case. The judge made a decision, imposed sentencing, was about to adjourn on the robbery, and then there's this discussion of the robbery. So it's not—I don't think the record supports that this was a joint sentencing proceeding in which Bruno was negotiating the robbery and talking about the murder. I don't think the record supports that. I think it does because it's the same counsel for both. It's the same judge for both indictments, 770 and 771. Okay, well, I guess just to jump in, you're making inferences that there is nothing in the record that indicates that this is what happened. You're saying, well, this is probably what happened because it's the same judge. But in terms of the procedure and what Mr. Bruno did or did not do before the sentencing, I don't—I don't see where in the record it indicates that these discussions about the robbery were part and parcel of the murder discussion. Well, I think it's part and parcel with the discussions with the prosecutor, with the prosecutor on oath, and then puts on the record that the judge— But just to stop you for a second, the discussion with the prosecutor before sentencing that we don't have on the record that you're speculating about. Well, basically, it's a fair inference based on the prosecutor's record right before proceeding with sentencing here. And so Mr. Bruno, hadn't he started—left himself open for the judge to pull the strings of how is that mitigating if he's still claiming that he's innocent or is expressing no recourse? Then later the judge could still say, fine, I'll sentence you to 20 years, but I'm going to put this four years consecutive. Or his conduct here potentially jeopardizes the future of the other case. That's—I mean, point to me to something in the record that says—where the party's saying, we're discussing this robbery or we're—because as I read the record, the first time the mention of the robbery charge comes up, it's after sentence has already been imposed on the murderer. Is that— So page 652 of the record, the top right of page 3 of the sentence. So Mr. Morfino goes into the PSR at the bottom of that page. And then the next page, four, the defendant has an open robbery. He pleads guilty to the robbery, willing to give him the C. If not, we're ready for trial as of Tuesday. And so the bare inference there is that the prosecution—the prosecutor and the defense attorney has talked about scheduling and the fact that they're ready to go to trial the next Tuesday. They've talked about what the outcome of the case is going to be. And so here—and even when you look at Mr. Bruno's statements as to the sentencing for this matter, he is right on top of the ball telling the court, the PSR, that prior to the felony, there was a wide logic occasion. He's not a predicate. On top, telling the court that—so then the sentence would not have to be a predicate felony. So he is very engaged— So what you're saying is it is a reasonable inference from the record that defense counsel had a strategy, which was to recognize that he had little opportunity to change the judge's impression of his client based on the murder trial, but at least he could salvage the other—avoid having a consecutive sentence. And that's what he did. Of course, that does not change the fact that the judge imposed the sentence on the murder charge without being asked to impose a lower sentence than that on the murder charge. That all was over when Bruno's strategy clicks in as to how we're going to minimize the damage here. Yes, but in terms of the judge could have easily rejected the people's offer or a defense agreement based on his conduct prior to that. And so looking at this in the sum total—and there really is no—this report has never said, as a minimum bar, a sentencing counsel has to make that phrase, Your Honor, I've asked for less time than the prosecutor is asking for. So there's no hard and fast rule, because counsels have strategies that might be endemic to that rule. And I think this is an instance in which if counsel said, for these reasons, a lower sentence should be imposed, the court would have followed up with many questions, and the answers might not have pleased the court. And I think that's why you go back to Cronick and Tell, which says, I'm not usually sure a can do the client a disservice. And so here, the court's main concern was, rehabilitation cannot start until you express remorse. And to go back to the expressions of remorse, even in the act of David from Mr. Baker in the 440 proceeding, it doesn't go far as saying, I feel sincere remorse at the crime line. Don't remorse that sentencing. It says, oh, I did not have the opportunity to express any level of remorse I had. And I think another point to look at is, even when we had all of these negating factors in the consolidated appeal before the appellate division first department, there was no excessive sentence claim. And so in any place, which Singo's at, it wasn't an unreasonable strategy to try to point to these negating factors and get a lower sentence. And so taking in some total, Mr. Berman. Yeah, of course, the AD, being the most powerful appellate court in the United States, had the ability to adjust the sentence, didn't it? Yes, in the interest of justice. And this would be unreviewable by the New York highest court. And so take it all together, Mr. Berman here, entered the proceedings with the strategy to not invoke the ire of the judge, had the sentence of 20 years. And the judge knows that the culpability was different, as you're about to point out. The person who actually threw down the flight of stairs got 25. He got 20. But on the video, you can see him leading the game, dragging him up, and pushing towards the top of the stairwell. What else was going to happen at the top of the stairwell at that time? And so if your honors have no questions, I ask that you affirm the denial of the writ. All right. Thank you. Thank you. Thank you. Let me make two points, briefly. First, there was no strategy here by Mr. Berman. Now, the strategy that opposing counsel was just talking about is nowhere apparent in the record, not in Mr. Baker's affidavit, not in his mother's affidavit, not in Mr. Bruno's statements, and certainly not in the sentencing transcript, where Mr. Bruno failed to speak up on his client's behalf until after the 20 years to life sentence had been imposed. So there was no strategy. Second, there was also no meaningful adversarial testing in this case, and so chronic was. I understand that prejudice is likely at the heart of this matter. Mr. Baker is entitled to the presumption of prejudice under United States versus Prime. I don't understand. You know, counsel, I appreciate it, but I don't understand why you're tying your shift to that. It's kind of like an all-or-nothing thing. So, your honor, we're not. For all the reasons that I discussed in my opening presentation, I do think that there is traditional and strickling prejudice here, primarily but not exclusively, because of the statements by the sentencing judge, both in the sentencing hearing and in the jury decision about Mr. Baker's level of involvement. So the unreasonable application of clearly established constitutional law is what? The unreasonable application of clearly established constitutional law is that it is a reasonable interpretation of chronic to say that this record shows adversarial testing, that chronic is a dead letter. And if not chronic, what? If not chronic, then strickling. If it's a reasonable interpretation of strickling to say that what Mr. Bruno did was an objectively reasonable strategy, then strickling is a dead letter. This was not just— No, but that doesn't account for the prejudice prong of strickling. Where is the unreasonable application of strickling in finding that there was no prejudice? So there, it was unreasonable for the sentencing court to conclude that Mr. Baker and Mr. Howitt were equally culpable. They both threw the victim down the flight of stairs. Those facts are simply not supported by the trial record. So, Your Honors, this is a failure on both levels, not just to present evidence that you investigated, to speak up on the client's behalf, to emphasize a limited role in events like the sentencing hearing. For all these reasons, Mr. Baker's position should be granted. All right. Thank you. Thank you both. We'll take the case under advisement. Nicely briefed, gentlemen. Very well argued. Very well argued. Thank you on both sides.